UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARIA KULPA, as Personal
Representative for the Estate
of Bronislaw Kulpa,

             Case No. 13-11048

    Plaintiff,       Hon. Terrence G. Berg

v.

JOHN CANTEA, et al,

    Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS'
## MOTIONS FOR SUMMARY JUDGMENT (DKTS. 58 & 66)

On October 4, 2011, Bronislaw Kulpa tragically died while in the custody of the Macomb County Jail. Plaintiff Maria Kulpa, Mr. Kulpa's widow, brought two lawsuits[1] against several Defendants[2] for alleged deliberate indifference to Mr. Kulpa's medical needs, excessive force, failure to intervene to prevent the use of excessive force, illegal policies and practices, inadequate training and supervision, and a custom of tolerance for failing to provide necessary medical care, all in alleged violation of 42 U.S.C. § 1983. Defendants moved for summary judgment (Dkts. 58 & 66). For the following reasons, the Court will **GRANT** Defendants' motions.

---

[1] On March 7, 2013, Plaintiff filed an initial lawsuit (Case No. 13-11048) against several jailers. On September 29, 2014, Plaintiff filed a separate lawsuit (Case No. 14-13763) against Macomb County, a jail nurse and private company contracted to provide medical care in the jail. The Court consolidated both suits into a single action (Dkt. 43).

[2] Defendants include the jail personnel – John Cantea, Kenneth Cucchiara, Jeffrey Rattray, Pamela Peck-Gagne, John Ladas, Dominic Gabriel, William Horan, David Abbott and Peter Martin – along with their employer, Macomb County. Defendants also include a jail nurse – Jackie Hand – along with her employer, Correct Care Solutions, LLC.

## BACKGROUND

Mr. Kulpa was arrested on September 27, 2011 and charged with felonious assault and domestic violence, allegedly perpetrated against his wife Maria Kulpa (Dkt. 58, Ex. 2, Police Report).  Kulpa was arraigned, bond was set at $2,500, and he was transported to the Macomb County Jail on September 28, 2011 (Dkt. 58, Ex. 3, Bond Order).

Medical and psychological care at the Macomb County Jail is provided by Defendant Correct Care Solutions.  During the intake process, Mr. Kulpa was evaluated by Correct Care personnel.  He denied drug or alcohol use or withdrawal, and stated that his medical history included high blood pressure, asthma, diabetes, prostate problems, and triple bypass surgery (Dkt. 58, Ex. 8, CCS Receiving Screening Form).  Correct Care personnel also identified Mr. Kulpa's current medications, which included Benzodiazepines with a risk of potential withdrawal. The jail does not permit prisoners to take Benzodiazepines while they are incarcerated.  As a result, Mr. Kulpa was placed in a detox unit at the jail, where he was evaluated twice daily (at 10:00 a.m. and 5:00 p.m.) under a Clinical Institute Withdrawal Assessment (CIWA) protocol (Dkt. 58, Ex. 10, Hand Dep. at 20, 31). The CIWA protocol evaluates inmates for factors such as nausea, tremors, sweating, agitation, auditory or visual disturbances, anxiety, headaches, and orientation (Dkt. 58, Ex. 12, Kulpa CIWA Charts).  As part of this protocol, medical staff also measure blood pressure, body temperature and pulse rate.  *Id.*  Under the CIWA protocol, a score below ten is considered "normal."   During his time in the Macomb

County Jail, Mr. Kulpa's highest CIWA score was eight, recorded on October 1, 2011. *Id.* On October 2 and 3, 2011, Mr. Kulpa's CIWA scores were zero. *Id.*

On October 4, 2011, Defendant Hand met with Mr. Kulpa at 5:30 a.m. to measure his blood sugar. Defendant Hand is a nurse employed by Correct Care. At this time, Mr. Kulpa told Defendant Hand that he did not want his blood sugar tested, because he was going to "die anyway" (Dkt. 58, Ex. 10, Hand Dep. at 31). Defendant Hand assured Mr. Kulpa that he would not die, and she reported that he was otherwise "very calm" and showed "no signs of any withdrawal" (Dkt. 58, Ex. 10, Hand Dep., pp. 14, 30-31, 57-58, 73, 77).

Later that same morning, at approximately 8:35 a.m., Defendant Cucchiara (a deputy in the jail) heard yelling in the area of Cell D-3, where Kulpa was housed. As he approached, he observed Mr. Kulpa sitting on a toilet "sniffing a cleaning sponge and yelling" (Dkt. 58, Ex. 17, Cucchiara dep., pp. 33-38, 40-41). Defendant Cucchiara immediately alerted the medical staff, advised them of his observations, and was directed to bring Mr. Kulpa to the medical area for evaluation and treatment (Dkt. 58, Ex. 17, Cucchiara Dep., pp. 38-40). The jail doctor, Maureen Onuigbo, "gave the order" for doses of Haldol and Ativan to be prepared. Dr. Onuigbo testified that these medications treat "agitation" and "withdrawal" and are used by patients who are too agitated to be safe to themselves or other people" (Dkt. 58, Ex. 13, Onuigbo Dep., pp. 29-30, 71-73).

The parties dispute what transpired next. Defendants contend that Defendant Cucchiara opened the cell door and advised Mr. Kulpa that he was

transporting him to medical for treatment. Mr. Kulpa responded "I don't want to go," pushed Defendant Cucchiara against the hallway wall and walked to the other end of the hallway where he began banging on a window and yelling (Ex. 17, Dep. Cucchiara, pp. 44-45, 47; Ex. 19, Jail Camera Videos 08:44:59-08:45:55). Plaintiff maintains that Mr. Kulpa did not push Defendant Cucchiara against the hallway wall; instead, it was Defendant Cucchiara who pulled Mr. Kulpa into the hallway. This interaction was captured on video (unfortunately, the jail security cameras do not include audio[3]) (Dkt. 58, Ex. 19, Jail Camera Video a2 d – block hallway, at 8:44-8:45:25 a.m.). The video appears to depict Mr. Kulpa initiating contact with Defendant Cucchiara by backing into him and shoving him away. *Id*. at 08:45:00 a.m. Defendants Cucchiara and Mileski are then seen gesturing to Mr. Kulpa, pointing down the hallway in the direction of the medical unit in an attempt to get him to walk voluntarily down to medical. *Id*. Mr. Kulpa does not comply, and instead walks in the other direction towards some windows. At 8:45:57, Defendants Cucchiara and Mileski then handcuff Mr. Kulpa behind his back and begin walking him down the hallway. Mr. Kulpa falls to the ground at 08:46:00, and takes Defendant Mileski to the ground with him. *Id*.

Working elsewhere in D block, Defendant Cantea (another jail deputy) went to investigate the "loud screaming" from the lower D block area and came upon Defendants Cucchiara and Mileski attempting to escort Kulpa, who was then

---

[3] The record does contain a shorter video, taken on a hand-held video camera that does contain audio (Dkt. 58, Ex. 26, Hand-Held Video). This video is 2 minutes and 12 seconds long, and depicts later events in the booking area of the jail, described more fully below.

handcuffed, down the hallway (Dkt. 58, Ex 16, Cantea Dep., pp. 18-20, 22-3, 25-6, 36-7; Ex 19: Video a1 and a3 08:46:34-9).

After seeing Defendants Cucchiara and Mileski struggling with Mr. Kulpa, and seeing Defendant Mileski and Mr. Kulpa fall to the ground, Defendant Cantea stepped in to replace Mileski (a female deputy) and assist Cucchiara (a male deputy) in escorting Mr. Kulpa (Ex 17: Cucchiara Dep., p. 53; Ex 15: Mileski Dep., p. 23; Ex 16, Cantea Dep., pp. 28, 37-8, 41, 43-4; Ex 19, Video a2 08:46:47-55 and Video a3 08:46:39-57). Mr. Kulpa appears to still be struggling, lifting his legs off the ground and dropping his weight, and at times Cantea and Cucchiara were "just carrying him" (*Id.*; *see also,* Ex 16, Cantea Dep., pp. 46, 54).

Defendant Abbott (a sergeant in the jail), then situated in the booking area of the jail, received word from another deputy (who could observe Defendants Cucchiara, Mileski and Cantea struggling with Kulpa on camera) that these deputies needed assistance with an unruly inmate, so Abbott dispatched Deputies Peck-Gagne, Rattray, Ladas, Gabriel and Horan, and then followed himself "to supervise" (Dkt. 58, Ex 18, McAllister Dep., p. 12; Ex 20, Abbott Dep., pp. 12-15; Ex 19, Video a4 08:47:34-49).

Defendant Abbott determined that Mr. Kulpa must be taken to booking, rather than medical, "[b]ecause he was being physical," and "we wouldn't have put the nursing staff in the position to be harmed by an inmate" (Dkt. 58, Ex 17, Cucchiara Dep., pp. 53, 55, 74; Ex 15, Mileski Dep., p. 23; Ex 16, Cantea Dep., pp. 29, 38, 54-5; Ex 21, Gabriel Dep., p. 21; Ex. 22, Rattray Dep., pp. 19-20).

The escorting officers indicated that, after arriving in the booking area, Mr. Kulpa continued to struggle by kicking and lifting his legs off the ground (Dkt. 58, Ex 20, Abbott Dep., p. 29; Ex 21, Gabriel Dep., pp. 14-5; Ex 22, Rattray Dep., pp. 15-6; Ex 23, Peck-Gagne Dep., pp. 13-4).  Kulpa also continued to talk in what Abbott interpreted as "gibberish," but which Peck-Gagne thought might be a language and Horan thought might be Polish (Dkt. 58, Ex 20, Abbott Dep., p. 47; Ex 23, Peck-Gagne Dep., pp. 13, 15-6; Ex 24, Horan Dep., pp. 24-34).

Defendants Cucchiara and Cantea then carried Kulpa into a detoxification cell (Dkt. 58, Ex 19, Video a6 08:45:38-45) and lowered the still struggling Kulpa face-down to the ground (Dkt. 58, Ex 19, Video a7 08:49:01-07).  Defendant Cucchiara then began removing the handcuffs from Kulpa (Dkt. 58, Ex. 19, Video a7 08:49:11 to 08:50:09).  At the time Cucchiara was removing the handcuffs, the video shows that Kulpa was moving around, and attempting to lift up the left side of his body.  *Id.*  In order to immobilize him, Defendant Cantea testified that he placed his left shin on Kulpa's left shoulder blade and his right knee on Kulpa's left upper buttocks (Dkt. 58, Ex 16, Cantea Dep., pp. 61-2, 64-5, 68-70, 121-4).  Plaintiff contests that placement of Defendant Cantea's knees, and says that Cantea's left knee was situated between Kulpa's shoulder blades, in the middle of his back.  The video recording supports Defendant Cantea's version of events; it shows Cantea's left knee applied to Kulpa's left shoulder at 08:49:06 and Cantea's right knee applied to Kulpa's lower back at 08:49:09, after Kulpa tried to roll onto his left side. The video shows Cantea's left knee comes off Kulpa's shoulder at 08:50:00 (44

6

seconds after being applied) and Cantea's right knee comes off Kulpa's low back at 08:50:02 (66 seconds after being applied).  *Id.*

After removing the handcuffs, Defendant Cantea then helped lift Kulpa from the floor into a restraint chair by holding Kulpa's left arm (Dkt. 58, Ex. 16, Cantea Dep., p. 129; Ex. 19, Video a7 08:50:24-37).  At this point, from the view offered by the video evidence, it appears that Mr. Kulpa is no longer resisting in any way after he is placed in the restraint chair.  It is not possible to tell precisely what Mr. Kulpa's physical condition was at that moment from viewing the videotape, but he does not move.  Although it is possible that Mr. Kulpa was already nonresponsive, Defendant Cantea testified that he perceived only that Kulpa had "just stopped resisting" (Dkt. 58, Ex. 16, Cantea Dep., p. 131).  The deputies then buckle Kulpa into the restraint chair and all leave the room at approximately 08:52:11 seconds in the video.  Defendant Peck-Gagne testified that she left the room and called medical to come attend to Mr. Kulpa, as she noticed a "spot of blood" from his nose (Dkt. 58, Ex. 23, Peck-Gagne Dep. p. 35).[4]  Defendant Peck-Gagne further testified that medical did not come down immediately, but that she had the impression from her phone conversation with the medical staff that they were on their way.  *Id.*

The last two minutes and fourteen seconds of the deputies' interaction with Mr. Kulpa, showing the time-frame from when he is being held on the floor as the

---

[4] In her deposition, Defendant Peck-Gagne references a report that she wrote of the incident, which indicates that she called medical at 8:50 a.m. (Dkt. 66, Ex. C p. 8 (filed under seal)).  Specifically, Peck-Gagne's report states "[a]s officers were putting inmate Kulpa in the chair[,] I called medical and talked to nurse Debbie Witkowski.  I told her that we needed inmate Kulpa checked because he was being put in the chair and that he was bleeding, I thought from the nose."  *Id.*

handcuffs are being removed until the point when Mr. Kulpa is placed in the restraint chair, is also captured on a hand-held video camera that contains audio. (Dkt. 58, Ex. 26, Hand-Held Video).  This video shows that Mr. Kulpa kicks with his right leg several times, and the deputies can be heard saying "Don't kick" (*Id.* at 00:15-19).  Some deputies also state that they believed Mr. Kulpa was "detoxing" or "DT-ing"  (*Id.* at 00:05-12; 00:36).   It is clear from this recording, as the deputies are lifting Mr. Kulpa into the chair and strapping him in, that he is not resisting; he appears limp and unconscious, but his skin color appears normal.  He appears to have a small cut or abrasion next to his left eye.  Just before the end of the recording, a female deputy's voice can be heard at the end of the tape saying "Get your ass down here" (*Id.* at 02:06-08).  The record is unclear whether this is Defendant Peck-Gagne calling medical, but it occurs at the same point in the chain of events when she testifies that she did so.  From the security camera video time-clock, the deputies are seen leaving the room at 08:52:11 (Ex. 19, Video a7 at 08:52:11).

   At 08:52:32, Defendant Cucchiara is seen re-entering the room and briefly glancing at Kulpa.  Cucchaara testified that he "checked the restraints, [and] made sure they weren't too tight or too loose" (Dkt. 58, Ex. 17, Cucchiara Dep. p. 72).  Kulpa does not appear to move in the video, and Cucchiara testified that he did not hear Kulpa make a noise or move.  *Id.* at 73.  Cucchiara then left the detox room walked to the medical duty station and began writing a report.  *Id.*

At 08:55:50, Defendant Peck-Gagne re-enters the detox room, and attempts to rouse Mr. Kulpa by rubbing his hand and touching his face (Dkt. 58, Ex. 23, Peck-Gagne Dep. p. 36). She is unable to wake him, and then runs out of the room to yell for immediate medical help. *Id.* at 37.

At 08:56:30, a nurse arrives along with several deputies, and they removed the restraints from Kulpa. He is lifted from the restraint chair, placed on his back on the floor at 08:57:09, and Deputy Horan began CPR, with assistance from Deputies Peck-Gagne and White (Dkt. 66, Ex. C p. 8). Medical personnel attempt to resuscitate Kulpa until approximately 9:23 a.m. Their efforts are ultimately unsuccessful, and a doctor from Mt. Clemens Regional Hospital pronounced Mr. Kulpa dead at 9:24 a.m. *Id.*

An autopsy performed by the Macomb County Medical Examiner determined that Mr. Kulpa died as a result of "Arteriosclerotic and Hypertensive Heart Disease Exacerbated by Physical Exertion and Restraint" (Dkt. 58, Ex. 27, Coroner's Report). In other words, Kulpa had a heart attack, brought on by his struggle with the deputies. Plaintiff's medical expert (Dr. Michael Baden) essentially agreed with this conclusion, and testified that there was no medical evidence to rule out the medical examiner's conclusion that Kulpa died from arteriosclerotic and hypertensive heart disease exacerbated by exertion during restraint and no medical evidence that asphyxia contributed to his death (Dkt. 76, Ex. 31, Dep. Baden, pp. 164-194).

9

## ANALYSIS

Summary judgment is appropriate only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reviewing a motion for summary judgment, a Court must view the evidence and draw all reasonable inferences in favor of the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Plaintiff's Complaint asserts three broad constitutional claims.  In Count I, Plaintiff contends that Defendant Cantea used "excessive force" against Mr. Kulpa (Dkt. 1) during the final struggle, when Cantea placed his knees on Kulpa's back and buttocks.  Count II asserts a claim against the remaining Defendant deputies – Cucchiara, Rattray, Peck-Gagne, Ladas, Gabriel, Horan, Abbott and Martin – for "failure to intervene" to prevent Defendant Cantea's alleged use of excessive force (Dkt. 1).  Counts I and II also incorporate somewhat rudimentary claims that the deputies were "deliberately indifferent" to Mr. Kulpa's "serious medical needs" (Dkt. 1, Compl. ¶¶ 45 and 58).  Plaintiff's Complaint does not allege in detail what specific medical need the deputies allegedly failed to address.

In a subsequently filed Complaint in a companion action (consolidated with the present case, Case No. 14-13763, Dkt. 16, Order of Consolidation).  Plaintiff asserts an Eighth Amendment claim against Defendants Macomb County and Correct Care for "failure to supervise/train" their employees and alleges a "custom or practice of tolerating the violation of federal rights" (Case No. 14-13763, Dkt. 1,

Compl. Counts II and III).  The subsequently filed Complaint also asserts a claim of deliberate indifference to Mr. Kulpa's medical needs against Defendant Hand (Count I), a jail nurse.  The deliberate indifference claim is premised on Plaintiff's allegations that Nurse Hand did not properly diagnose or treat Mr. Kulpa for signs of alcohol withdrawal, or delirium tremens.

Defendants argue that they are entitled to summary judgment for the following reasons:  (1) all the individual Defendants are entitled to qualified immunity, as they did not violate any clearly established federal right of Mr. Kulpa; (2) Defendant Cantea did not use excessive force against Mr. Kulpa, as his actions were neither malicious or sadistic nor objectively unreasonable, and were necessary to subdue Mr. Kulpa because he was struggling; (3) Defendants Cucchiara, Rattray, Peck-Gagne, Ladas, Gabrial Horan, Abbott and Martin did not observe any unlawful conduct against Mr. Kulpa, thus any claim for failure to intervene fails; (4) none of the Defendants were deliberately indifferent to Mr. Kulpa's medical needs; and (5) Plaintiff failed to establish a factual basis sufficient to create a genuine issue of material fact that employer Defendants (Macomb County and Correct Care) had a custom or practice of violating inmates' federal rights or that their training procedures were constitutionally deficient.

## A. Summary Judgment Standard

Summary judgment is proper where the record shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  A dispute is genuine only if "the evidence

11

is such that a reasonable jury could return a verdict for the nonmoving party."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202
(1986). The moving party bears the initial burden of demonstrating the absence of a
genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317,
323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met that
burden, the non-moving party must point to evidence supporting its position that is
"significantly probative" and more than "merely colorable." *Liberty Lobby*, 477 U.S.
at 249, 106 S.Ct. 2505. "The mere existence of a scintilla of evidence in support of
the plaintiff's position will be insufficient" to defeat a motion for summary
judgment. *Id.* at 252, 106 S.Ct. 2505.

In adjudicating Defendants' motions, the Court views the facts and draws
reasonable inferences in the light most favorable to the non-moving party, Plaintiff.
*See Harrow Prods., Inc. v. Liberty Mut. Ins. Co.*, 64 F.3d 1015, 1019 (6th Cir. 1995).
In the context of qualified immunity, this posture generally requires the court to
adopt the plaintiff's version of the facts. *See Scott v. Harris*, 550 U.S. 372, 378, 127
S.Ct. 1769, 167 L.Ed.2d 686 (2007). There is an exception, however, "[w]hen
opposing parties tell two different stories, one of which is blatantly contradicted by
the record, so that no reasonable jury could believe it." *Id.* at 380, 127 S.Ct. 1769.
This exception most commonly applies where the record contains a videotape
depicting the disputed facts and contradicting one party's version of events. *See id.*
at 379–80, 127 S.Ct. 1769; *Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015). In
such a scenario, the court must view the facts "in the light depicted by the

12

videotape." *Scott*, 550 U.S. at 381, 127 S.Ct. 1769.  The court must draw reasonable inferences in favor of the nonmoving party from the video recording, but only "to the extent supportable by the record."  *Id*. at 381 n. 8, 127 S.Ct. 1769 (emphasis omitted); *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("a court need draw only reasonable inferences in favor of the nonmoving party; it need not construe the record 'in such a manner that is wholly unsupportable—in the view of any reasonable jury—by the video recording'" *Marvin v. City of Taylor*, 509 F.3d 234, 239 (6th Cir. 2007)).

### B. Qualified Immunity

Qualified immunity shields police officers from civil liability unless the plaintiff can show: (1) the official violated a statutory or constitutional right, and (2) that right was "clearly established" at the time of the challenged action.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).  Courts have discretion to analyze these steps in any order.  *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).  Bypassing the constitutional question is particularly appropriate where "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id*. at 237, 129 S.Ct. 808.

### 1. Deliberate Indifference

The standards for deliberate indifference were clearly established well before Mr. Kulpa's incarceration. *See Pearson*, 555 U.S. at 232.  In *Estelle v. Gamble*, 429

U.S. 97, 103 (1976), the Supreme Court found that Eighth Amendment[5] "principles establish the government's obligation to provide medical care" to inmates and that an inmate "must rely on prison authorities to treat his medical needs." Therefore, the Court held that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison nurses and doctors in their response to the prisoner's needs, or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. *Id.* at 104 (internal citations and quotations omitted). In *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Supreme Court reiterated that the Eighth Amendment imposes a duty on prison officials to provide adequate medical care and take reasonable measures to guarantee inmates' safety. The Court also clarified that deliberate indifference is only actionable if two requirements are met: (1) the official must fail to protect an inmate from an objective, "sufficiently serious" harm; and (2) the official must subjectively have a "sufficiently culpable state of mind." *Id.* at 834.

Objectively, a medical need is sufficiently serious "if it has been diagnosed by a physician that has mandated treatment or it is so obvious that even a lay person would easily recognize the need for medical treatment." *Burgess v. Fischer*, 735 F.3d

---

[5] Under the Fourteenth Amendment, pretrial detainees have a right to medical treatment that is analogous to the right of prisoners under the Eighth Amendment. *See Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 776 (6th Cir. 2012). To prove a deprivation of that right, Plaintiff must show that the defendants acted with "deliberate indifference to serious medical needs." *Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009) (quotation marks omitted).

462, 476 (6th Cir. 2013) (emphasis added).  In recognizing the "obviousness"
approach, the Sixth Circuit identified that an inmate is especially vulnerable to
obvious deliberate indifference during emergency medical situations "because they
involve life-threatening conditions or situations where it is apparent that delay
would detrimentally exacerbate the medical problem . . . ." *Blackmore v. Kalamazoo
Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004) (emphasis added) (internal quotations
omitted).

Subjectively, an official's state of mind is sufficiently culpable if the official
"acted with 'deliberate indifference' to a serious medical need."  *Harrison v. Ash*, 539
F.3d 510, 518 (6th Cir. 2008).  An official is deliberately indifferent if "the official
knows of and disregards an excessive risk to inmate health or safety; the official
must both be aware of facts from which the inference could be drawn that a
substantial risk of serious harm exists, and he must also draw the inference."
*Farmer*, 511 U.S. at 837.  But an official is not free to ignore obvious dangers to
inmates and may be liable even if he or she does not know the exact nature of the
harm that may befall a particular inmate. *Id*. at 843–44. "Since government officials
do not readily admit the subjective component, a factfinder may infer from
circumstantial evidence, including the very fact that the risk was obvious, that a
prison official knew of a substantial risk." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th
Cir. 2013) (emphasis added) (internal quotations omitted).

Context informs whether – viewed in the light most favorable to the plaintiff
– the alleged facts demonstrate that the correctional officers and medical personnel

15

were deliberately indifferent to an inmate's serious medical needs. *See, e.g.,*
*Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550–52 (6th Cir. 2009) (finding that a
prison medical professional with knowledge of critical environmental factors and an
inmate's response to those factors could be found deliberately indifferent for
delaying a medical assessment or medical treatment); *Clark-Murphy v. Foreback*,
439 F.3d 280, 290 (6th Cir. 2006) (noting that a prison employee must have
"sufficient exposure" to the inmate and the inmate's medical concerns to exhibit
deliberate indifference); *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d
834, 844–47 (6th Cir. 2002) (holding that officials may be found deliberately
indifferent if the officials had knowledge of a person's history of medical
emergencies at the facility and the environmental factors present in the facility
immediately preceding a person's death).

Here, the record demonstrates that Mr. Kulpa had serious medical needs: he
reported a history of high blood pressure, asthma, triple bypass surgery, diabetes,
prostate problems and smoking.  Furthermore, he was being monitored for potential
Benzodiazepine withdrawal symptoms, although during his intake at the jail, he
reported no history of withdrawal from alcohol and denied that he had ever been
treated for alcohol abuse.  In the context of Mr. Kulpa's individual situation, the
question is whether there is a genuine issue of material fact as to whether
Defendants acted with "deliberate indifference" to Kulpa's needs.  To show that the
officers acted with deliberate indifference, Plaintiff must "allege facts which, if true,
would show that the [officers] subjectively perceived facts from which to infer

16

substantial risk to [Kulpa], that [the officers] did in fact draw the inference, and that [the officers] then disregarded that risk." *Id.* at 368 (quotation marks omitted). As for a defendant's subjective knowledge, "a factfinder may conclude that a [defendant] knew of a substantial risk from the very fact that the risk was obvious." *Id.* (quotation marks omitted).

Plaintiff alleges that Defendant Cantea was "deliberately indifferent" to the fact that his conduct in pinning "Bronislaw Kulpa belly down to the cement floor with his knees, bearing full weight upon Kulpa's lower spine and neck would cause Kulpa to have a heart attack and/or asphyxiate" (Dkt. 1, Compl., ¶¶ 33, 41). However, the evidence presented to the Court does not support this claim. Kulpa did not asphyxiate and suffered no injury to his spine or neck. Further, although Kulpa was a heart patient who had previous bypass surgery, the deputies were not privy to any medical information regarding his cardiac or pulmonary vulnerabilities.

Here, the record before that Court does not establish that the deputies failed and/or refused to provide medical attention. Defendant Cucchiara initially observed Kulpa's unusual behavior and contacted medical immediately. Cucchiara was attempting to comply with Dr. Onuigbo's directive to provide medical treatment when he removed Kulpa from the cell. Although the deputies struggled with Kulpa, and he was temporarily pinned to the ground while his hand-cuffs were removed prior to lifting him into the restraint chair, their purpose was to put him into a position where treatment could be safely rendered. Once Kulpa was placed in the

17

restraint chair, the deputies left him briefly while waiting for medical to arrive. Defendant Peck-Gagne went back into the cell where she found Kulpa unresponsive and immediately "started yelling for help" (Dkt. 58, Ex. 19, Video a7 detox 08:55:52-08:56:11).

Plaintiff argues that the deputies delayed summoning medical help after securing Mr. Kulpa in the restraint chair (Dkt. 71 at 21-22). In support of this proposition, Plaintiff cites *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 599 (6th Cir. 2005). In *Owensby*, the Sixth Circuit affirmed the district court's denial of qualified immunity to several police officers involved in a fatal encounter with an arrestee. The officers involved in *Owensby* struck the arrestee repeatedly with a baton, sprayed mace in his face twice from six inches away, used pressure point pain compliance techniques, kneed him, and then locked him in the back of a police cruiser, handcuffed and "possibly unconscious." *Id*. at 600. Other officers arrived on the scene, and "[n]ot[ed] that Owensby was bleeding and appeared unable to breathe, [and stated] 'This looks f[—]ed up. Can he breathe? It don't look like he can from the way he's laying.' Nevertheless, [the officers] failed to investigate Owensby's condition any further and did not attempt to provide him with any medical care." *Id*. The Sixth Circuit explained:

> [A]t least eleven Cincinnati police officers and two Golf Manor officers were either on the scene or in the immediate vicinity—three of whom were trained emergency medical technicians—yet no officer attempted to provide any medical care to Owensby. Instead, the uncontroverted testimony indicates that the officers greeted each other, secured items that might have been dropped, prepared for the arrival of their supervisors and made sure that their uniforms were intact.

*Id.* at 600-601.  Owensby sat in the back of the cruiser for approximately six minutes, until a sergeant arrived and asked for the windows to be rolled down so that he could check on him.  The sergeant promptly discovered that Owensby was not breathing, and he summoned EMTs, who arrived four minutes later.  The EMTs attempted CPR, but Owensby could not be revived.

The facts in this case are distinguishable from *Owensby* for several reasons. First, none of the deputies in the present case observed Mr. Kulpa in any visible distress, and the video tapes presented to the Court fully comport with their testimony.  Defendant Cantea testified that, once Kulpa was placed in the restraint chair, he perceived that Kulpa simply "stopped resisting."  Likewise, when Defendant Cucchiara re-entered the detox room, he did not notice Kulpa exhibiting any visible signs of distress, and he stated that his purpose of re-entering was to re-check that the restraints on the chair were secured.  Finally, when Defendant Peck-Gagne entered to check on Kulpa, she attempted to rouse him, was unable to do so, and immediately summoned medical help.  In *Owensby*, several police officers noted that Owensby was in great distress, was struggling to breathe, and yet they did nothing to summon help or intervene.  To those officers, Owensby's serious medical needs were obvious.  In the case before the Court, none of the deputies observed Kulpa exhibit any outward signs of distress; the serious nature of his medical condition did not become obvious until Defendant Peck-Gagne determined that Mr. Kulpa was unresponsive.

Second, this case is distinguishable from *Owensby* because the entire purpose of removing Kulpa from his cell, and later placing him in a restraint chair, was to get him medical treatment. At first, the deputies attempted to convince Kulpa to walk voluntarily to the medical unit to be evaluated by the medical staff. Kulpa refused and instead fought with the deputies, pushing Cucchiara, falling to the ground and taking Mileski with him, and yelling at them. The deputies, fearing that an unruly Kulpa could harm the civilian medical staff, then carried him to a booking room to remove his handcuffs and place him in a restraint chair, so that he could safely be examined and treated. There is no evidence that any of the deputies acted with a "culpable state of mind" that might create an issue of fact that they showed deliberate indifference to a serious medical need. The record indicates that the deputies were unaware of Kulpa's underlying cardiac condition and unaware that Kulpa might suffer a sudden cardiac death from exertion. The deputies alerted medical to Kulpa's movement and condition throughout the process. As soon as Defendant Peck-Gagne discovered that Kulpa was uncooperative, she called for immediate emergency medical care. The record before that Court leads to a conclusion that the deputies did not ignore Kulpa's medical condition. Rather, they were attempting to transport a combative and recalcitrant detainee to the medical unit for treatment at the time of the final, and tragically fatal, encounter.

As to Defendant Hand, Plaintiff alleges that she did not properly diagnose or treat Mr. Kulpa for signs of alcohol withdrawal, or delirium tremens. The record

does not indicate that Defendant Hand was ever aware or suspected Mr. Kulpa had been arrested for an alcohol-related offense, that he was an alcoholic, or that he exhibited signs or symptoms of withdrawal from drugs or alcohol, as indicated on the CIWA protocol withdrawal monitor. "While delirium tremens is a serious medical condition, which generally requires immediate hospitalization, the same is not true of general alcohol withdrawal, which typically may be managed in a prison setting and indeed frequently is managed there." *Speers v. Cty. of Berrien*, 196 Fed. App'x 390, 395 (6th Cir. 2006). The record lacks sufficient evidence from which a reasonable jury could conclude Defendant Hand was aware Mr. Kulpa had a serious medical need involving "acting out" as a result of active alcohol or drug withdrawal. "[C]ourts are generally reluctant to second guess the medical judgment of prison medical officials." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 944 (6th Cir. 2010).

Based on the facts presented to the Court, Defendant Hand reasonably believed Mr. Kulpa was stable and not in at risk of any harm from any type of substance withdrawal. Indeed, Kulpa was being actively monitored for any signs of withdrawal from Benzodiazepines with the CIWA protocol – the same protocol used for the assessment and management of alcohol withdrawal (Dkt. 58, Ex. 12, CIWA Charts). This protocol involved a prison nurse examining Kulpa for any signs of nausea and vomiting, tremors, sweating, agitation, tactile, auditory or visual disturbances, anxiety, headaches, orientation (each rated on a scale of 0 to 7 – with the exception of orientation which is scored 0 to 4 – these scores are added together a maximum cumulative score of 67) along with measurements of Kulpa's blood

pressure, temperature and pulse rate.  A cumulative score of less than 10 indicates that a patient does not need additional treatment for withdrawal.  The maximum CIWA score that Kulpa registered during his incarceration at the jail was 8, on the morning of October 1, 2011.  *Id.* On October 3, 2011, the day before Kulpa passed away, his CIWA Chart indicates scores of zero in both the morning and the evening. *Id.*  This evidence does not support a reasonable inference that Kulpa was in the throes of alcohol withdrawal, which were then ignored by Defendant Hand or any other medical staff.

In sum, Plaintiff has failed to establish a material fact dispute that any Defendant was deliberately indifferent to Kulpa's medical needs.  Therefore, Defendants are entitled to summary judgment on this claim.

### 2. Excessive Force

Excessive force claims can be resolved under the Fourth, Eighth and Fourteenth Amendments – the applicable amendment depends on the plaintiff's status at the time of the incident: a free citizen in the process of being arrested or seized; a convicted prisoner; or a person occupying the "gray area[s]" between the two.  *Burgess*, 735 F.3d at 472; *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002). When a free citizen claims that a government actor used excessive force during the process of an arrest, seizure, or investigatory stop, the Court performs a Fourth Amendment inquiry into what was objectively "reasonable" under the circumstances. *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Lanman v. Hinson*, 529 F.3d 673, 680 (6th Cir. 2008).  These Fourth

Amendment protections extend through police booking until the completion of a probable cause hearing. *Aldini v. Johnson*, 609 F.3d 858, 866–67 (6th Cir. 2010).

When convicted prisoners bring claims of excessive force, Courts turn to the Eighth Amendment, which forbids the "unnecessary and wanton infliction of pain" that constitutes "cruel and unusual punishment," and specifically conduct that is malicious and sadistic. *Hudson v. McMillian*, 503 U.S. 1, 5, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)); *United States v. Budd*, 496 F.3d 517, 531–32 (6th Cir.2007).

Until recently, it was unclear which standard applied to excessive force claims brought by pretrial detainees, which is what Mr. Kulpa was. The Supreme Court has recently clarified, however, that when assessing pretrial detainees' excessive force claims Courts must consider whether the plaintiff shows "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 2473, 192 L.Ed.2d 416 (2015). The inquiry is highly fact-dependent, and must take into account the "perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* It should also account for "the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,'" *id.*, and defer when appropriate to "'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security'" *Id.* (quoting *Bell v.*

23

*Wolfish*, 441 U.S. 520, 540, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). The Court further instructs:

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id*. This list is not exclusive. *Kingsley* also reaffirms that pretrial detainees cannot be subjected to "the use of excessive force that amounts to punishment," *id*. (quoting *Graham*, 490 U.S. at 395 n. 10, 109 S.Ct. 1865) precisely because they "cannot be punished at all," *id*. at 2475.

In the present case, the record – particularly the video recordings – indicates that Kulpa physically resisted the efforts of the deputies to escort him to the medical unit to receive treatment, initially pushing Cucchiara against a wall, causing Mileski to fall to the ground, struggling against his escort and even kicking at officers as they attempted to free him from handcuffs. Plaintiff alleges that Defendant Cantea applied excessive force by using his knees to hold Kulpa down when Cucchiara was attempting to free Kulpa from handcuffs. The video of this interaction shows that Defendant Cantea's knee was on Kulpa's shoulder for 44 seconds, and his right knee on Kulpa's lower back/buttocks for an additional 22 seconds. The video also depicts that Kulpa was non-compliant, struggled and resisted the deputies' attempt to maintain order and facilitate medical care.

The record before the Court indicates that the amount of force applied by Defendant Cantea was objectively reasonable. Kulpa sustained no weight force

injuries and his death was not caused by weight force asphyxia (Dkt. 58, Ex. 27, Coroner's Report).  There is insufficient evidence in the record to establish that Defendant Cantea was motivated by anything other than the legitimate law enforcement interests of preserving order and safety in the jail, and there is no proof that Cantea inflicted gratuitous pain on Kulpa.  This case is clearly distinguishable from *Coley v. Lucas Cty., Ohio*, 799 F.3d 530, 534 (6th Cir. 2015), where jail guards shoved a handcuffed inmate to a cement floor, held him in a chokehold to the point of unconsciousness, then left him to die in his cell without summoning medical help.

The other authorities relied upon by Plaintiff are likewise inapposite.  In *Champion v. Outlook Nashville, Inc*., 380 F.3d. 893 (6th Cir. 2004) a "gratuitous use of force" was applied to a "mentally ill arrestee" who had already been "handcuffed and hobbled" and who was "subdued and incapacitated."  The decedent in *Champion* died from "asphyxia" caused by "weight force" from three officers "sitting" and "lying" on his back while repeatedly deploying "pepper spray."  The Sixth Circuit held that "it [was] clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Champion*, 380 F.3d at 903.  By contrast, in this case, the force applied by Cantea was not "gratuitous," nor was it applied after Kulpa was "subdued and incapacitated."  The force used to restrain Kulpa was applied to remove the handcuffs to allow Kulpa to be placed into a restraint chair so that he could receive

25

medical attention.  No expert opined that Kulpa died from "asphyxia" and Cantea did not "sit" or "lie" on his back for a prolonged period of time.

As for the other deputies, generally, "an officer who is merely present at the scene but is not directly responsible for the complaint of action is entitled to qualified immunity," even if the officer participates in events wherein excessive force is used. *Wilson v. Morgan*, 477 F.3d 326,337 (6th Cir. 2007), *Landus v. Galarneau*, 483 Fed. App'x. 209, 211 (6th Cir. 2012).  In some circumstances, an officer can be liable for "failure to intervene" against another officer's unlawful conduct. But such liability can arise only "when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). It is the burden of the plaintiff to establish that an officer should have known excessive force was being used and that he had the opportunity and means to intervene. *Burgess*, 735 F.3d at 475.

In this case, the facts presented do not raise a genuine issue of material fact that any of the other deputies had reason to know that Cantea was applying excessive force when he held Kulpa down as Cucchiara removed the handcuffs.  To the contrary, the Court finds that the force applied by Cantea was objectively reasonable, given the circumstances.  Furthermore, the record does not establish a factual dispute that any other deputy had the opportunity or means to prevent Cantea's minute-long application of force.

As such, Defendant Cantea is entitled to summary judgment on Plaintiff's excessive force claim, and the remaining deputies are entitled to summary judgment on Plaintiff's failure to intervene claim.

### C. Municipal & Supervisory Liability

To establish municipal liability for a failure to train, a plaintiff must show (1) the training program is inadequate to the task the officer must perform, (2) the inadequacy is a result of the municipality's deliberate indifference, and (3) the inadequacy is "closely related to" or "actually caused" the plaintiff's injury. *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008). To show deliberate indifference, a plaintiff "'must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Id*. (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir.2005)). Alternatively, a single violation, "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Id*.; *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

In this case, Plaintiff has not shown a pattern of abuses illustrating that Macomb County or Correct Care was on notice that their training was deficient. Plaintiff has not marshaled the evidence necessary to show that the employer Defendants' training was so deficient and so likely to cause injury that the failure to

27

train was obvious.  The Court finds that Plaintiff has "supplied too little Rule 56 evidence to create a genuine issue of material fact" regarding his theory of municipal or supervisory liability.  *See Peet v. City of Detroit*, 502 F.3d 557, 567 (6th Cir. 2007) (finding that the plaintiff presented "insufficient Rule 56 evidence to create a trial-worthy dispute over whether Detroit has a custom of tolerating federal rights violations"); *see also id.* at 568 (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005), to state: "A custom or policy must be shown by 'a clear and persistent pattern,' and ... [ ] no reasonable juror could 'infer a municipal-wide policy based solely on one instance of potential misconduct'").  Plaintiff has not made this showing.

As such, Defendants Macomb County and Correct Care are entitled to summary judgment on these claims.

## CONCLUSION

For the reasons set forth above, Defendants' motions for summary judgment (Dkts. 58 & 66) are **GRANTED**.  Judgment shall be entered in favor of Defendants, and against Plaintiff.

**SO ORDERED**.

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

Dated:  September 30, 2016

28

**<u>Certificate of Service</u>**

I hereby certify that this Order was electronically submitted on September 30, 2016, using the CM/ECF system, which will send notification to each party.

<u>s/H. Monda in the absence of A. Chubb</u>
Case Manager